72 N.J. Super. 402 (1962)
178 A.2d 358
STANDARD ACCIDENT INSURANCE COMPANY, A CORPORATION OF THE STATE OF MICHIGAN, AUTHORIZED TO ENGAGE IN THE BUSINESS OF INSURANCE IN NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALLSTATE INSURANCE COMPANY, A CORPORATION OF THE STATE OF ILLINOIS, AUTHORIZED TO ENGAGE IN THE BUSINESS OF INSURANCE IN NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1962.
Decided March 1, 1962.
*403 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. John J. Gaffey argued the cause for appellant (Messrs. Gaffey & Webb, attorneys).
Mr. H. Curtis Meanor argued the cause for respondent (Messrs. Lamb, Langan & Blake, attorneys; Mr. Meanor, of counsel).
*404 The opinion of the court was delivered by FREUND, J.A.D.
Defendant Allstate Insurance Company (Allstate) appeals from a declaratory judgment entered in the Superior Court, Chancery Division, in favor of plaintiff Standard Accident Insurance Company (Standard), finding that a second permittee was an additional insured under a policy issued by Allstate protecting the owner of the vehicle involved in the accident. Both companies had written automobile liability policies; Allstate's policy insured Einar Aslaksen; Standard's insured Fred H. Baker, Jr., and contained a clause providing for excess insurance only if there was other "valid and collectible insurance." Baker was involved in an automobile accident while driving Aslaksen's car with the permission of Aslaksen's son. The issue presented is whether Baker was an additional insured within the meaning of the omnibus clause of Aslaksen's policy, thus making Allstate liable for his defense, or whether Baker had to look to Standard, his own insuror.
The testimony indicates that Einar Richard Aslaksen is the son of Allstate's named insured. He and Baker were neighbors and school acquaintances for four or five years before September 1957, when they entered the Marine Corps. In March 1958, after their release from active duty, they continued to be good friends. On August 10, 1958, the day of the accident, both were 19 years of age. The Aslaksen family group consisted of young Aslaksen, his father and mother. The latter, however, did not drive.
In April 1956 when young Aslaksen obtained his driver's license the father owned a 1949 Pontiac automobile. He was given permission by his father rather infrequently to use the car principally for week-end social functions and for traveling to and from meetings of the Marine Corps Reserve in Dover, N.J. Each time he wanted to use the car he was required to ask for permission from his father. While stationed as a marine at Parris Island, South Carolina, he did not have the use of his father's car and did not return home until he had completed his six-month tour *405 of duty. He was not sure if his father knew of his friendship with Baker before they entered military service.
In September 1957 Aslaksen (father) purchased a 1957 Oldsmobile. When young Aslaksen returned from Parris Island in March 1958, his father gave him the keys to the family's 1949 Pontiac. The son testified that at that time he received no instructions as to the use of the Pontiac.
There was a period of approximately five months between the day the car keys were handed over to the son and the day Baker had the accident. During that time the registration certificate was left in the Pontiac glove compartment and the father paid for its renewal. The son, however, bought all the gas and oil, attended to the general upkeep of the car and made necessary minor repairs. He drove the Pontiac to work every day and also used it for social purposes. He no longer asked his father's permission every time he wished to use the car since he now had what he described as a "blanket permission." In depositions before trial young Aslaksen, in answer to a question about instructions given him by his father after his return from service, said
"When I started to work my father told me that I was to use the car to go to work and for anything that I might have needed the car for in order so that I wouldn't get my hands on his new car."
However, he stated that on one occasion his father had seen him driving a friend's car and had said, "Well, just because you drive his car, that does not mean that you should loan my car to anybody else." The son said of his father, "I'll tell you for sure he did not say I could loan the car to anybody," and "He certainly did not relinquish the use of the car for me to let anybody else use it."
Aslaksen (son) admitted he had been a passenger in Baker's Ford and had himself driven it when Baker was present. He could not remember whether he had driven it without being accompanied by Baker. The son acknowledged his father had met Baker after their release from service *406 but could not remember whether the elder Aslaksen had seen the two young men together in the Pontiac. The father had never given any instructions that Baker was not to be a passenger in the car. The son stated he had loaned the Pontiac to Baker on only one occasion previous to the accident.
On Friday night, August 7, 1958, Aslaksen (son) was preparing to go to the shore for the weekend with a girl friend and her family. The Baker automobile at this time was in disrepair. By prearrangement, he drove the Pontiac to his girl's house, left it there and placed the keys in the milk box where Baker could find them. He had agreed with Baker that he could have the car the following night for a date. He could not remember whether Baker had asked for the use of the car or whether he had offered it to him, but he nevertheless gave him permission to use it. Baker was supposed to return the car to the girl's house on Saturday night. On August 10, while Baker was driving, he was involved in a collision with an automobile owned and operated by Elias H. Pinsker. When Aslaksen returned from the shore, he found the car "a total wreck" in a Montclair garage. He was able to get the car released from the garage only by signing the certificate of ownership himself, even though the registration was in his father's name.
Baker's testimony essentially corroborated Aslaksen's, except that he stated young Aslaksen had asked him if he would like to borrow the car for the night. Baker said Aslaksen agreed to "take the responsibility." He stated at one point that he was not sure who was the registered owner of the Pontiac but later testified "I was under the understanding that it was his [the son's] and it was not in his father's name."
The elder Aslaksen testified to the same effect as his son regarding the limited permission given the son to use the only car in the family before he left for Parris Island. Aslaksen stated that upon his son's return
*407 "I told him that I had kept the Pontiac for the purpose that he could use that because I did not want him to use the Oldsmobile; but that did not mean to say that I was turning over the ownership. * * * I told him that he could use the car, I would give him one set of keys for him to use, but the car is in my name and my registration; I had just got a new registration in January of that year; and he could use the car, but the car was in my name and I was the owner of the car."
At one time (he was unable to recall the date) he told his son "that I did not want him to loan it to anybody else, because I was not going to be involved, I did not want to be involved in any occurrence like what we have now."
The father recalled that Baker had occasionally visited the Aslaksen's home and that the two young men would go out together. He was definite about the fact that Baker had not requested his permission to use the car on the weekend of the accident, nor had his son asked permission to loan it to Baker.
Subsequent to the accident the son purchased a 1938 Chevrolet with his own funds, placing the title to the car in his father's name. The Chevrolet was added to the father's current Allstate policy in place of the Pontiac.
Pinsker instituted an action against Baker and Aslaksen (father) to recover damages for personal injuries. When Standard made a demand on Allstate to defend and indemnify Baker as an additional assured, it refused. Whereupon Standard instituted the present declaratory judgment suit in the Superior Court, Chancery Division, seeking to have Baker declared an additional insured under the omnibus clause of the Allstate policy. The Pinsker suit was reached and tried prior to the determination of the present action, and resulted in a judgment of $4,085.19 against Baker.
The Chancery Division judge held that this case was controlled by the decision in Costanzo v. Pennsylvania Threshermen, etc., Ins. Co., 30 N.J. 262 (1959), whose facts he found to be very similar to those of this appeal, *408 and concluded that Baker was an additional insured under the omnibus clause of the Allstate policy.
Allstate argues that there was no evidence to establish permission by the father to Baker, the second permittee, to use the Pontiac and that the determination of the trial judge was contrary to the weight of the evidence. It also urges that a "More Automobiles Than Operators" (MATO) endorsement to Aslaksen's policy relieved it from any responsibility for the payment of the judgment recovered by Pinsker against Baker.
Allstate's omnibus clause insured, among others, "any other person with respect to the owned automobile, provided the actual use thereof is with the permission of the named insured." Our Supreme Court has recently had occasion to extensively construe similar clauses contained in standard automobile liability insurance policies. Indemnity Ins. Co. v. Metropolitan Casualty Ins. Co., 33 N.J. 507 (1960); Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488 (1960); Baesler v. Globe Indemnity Co., 33 N.J. 148 (1960); Costanzo v. Pennsylvania Threshermen, etc., Ins. Co., supra (30 N.J. 262). See 15 Rutgers L. Rev. 155 (1961), "Automobile Liability Insurance: Public Policy and the Omnibus Clause in New Jersey."
It is well established that when the named insured gives another (the first permittee) permission to use his insured automobile, without more, the first permittee is not thereby authorized to allow another (the second permittee) to use it. The factual determination must be made in every case as to whether the initial grant of permission was broad enough to include an implied grant of authority to the first permittee to give the second permittee full use of the automobile and thus to render him an additional insured under the omnibus clause. Baesler v. Globe Indemnity Co., supra, 33 N.J., at pp. 151-2, and authorities cited.
Our review of the proofs leads us to conclude that the younger Aslaksen was given so broad an initial grant of authority over the Pontiac upon his return from Parris *409 Island, which grant continued undisturbed for five months, that he had an implied grant of authority to let Baker use the automobile on the weekend of the accident. The son used the car as his own and paid for substantially all the expenses involved in its maintenance. He operated it daily and was not required to account to his father for its use.
While there is no doubt that the father kept a careful watch on his son's use of the Pontiac before he entered the Marine Corps, that vigilance was relaxed almost to the point of disappearance once the young man was released from military service. The father surrendered the keys, turned over the car's registration certificate, no longer paid for its maintenance and passed all operative control over the Pontiac to his son. It is clear that he only retained the Pontiac so that his son would have a vehicle for his own purposes. The elder Aslaksen's testimony indicated that he wanted his recently purchased Oldsmobile for his own use. The father's feelings and attitude about the two-car problem are natural and understandable. They recur regularly in thousands of our homes and are now commonplace in American family life.
A further consideration that must be noted is that when the son later acquired his Chevrolet he listed it in his father's name, both for registration and insurance purposes. This indicates to us that neither of them considered the name of the "owner" or "named insured" of the son's car to be vital.
To be considered against this background is the testimony of both father and son as to the admonitions against lending the Pontiac to anyone else. Allstate relies upon these various incidents to reverse the decision below citing Baesler v. Globe Indemnity Co., supra. There the parties stipulated that the first permittee was expressly prohibited by the named insured from allowing others to use the vehicle. Nevertheless, the first permittee gave it to a friend to use for a social engagement. While this second permittee was *410 driving, an accident occurred. He was held not to be an additional insured. Baesler is clearly distinguishable.
In the instant case there was no stipulation as to whether there was an express prohibition by the named insured. Nor did the trial judge reveal in his opinion whether he found there was an express prohibition within the meaning of Baesler. The testimony on this point, however, is so clear and convincing that we have no hesitancy in making an independent finding of fact. R.R. 1:5-4, made applicable to the Appellate Division, R.R. 2:5. Indeed, both parties agreed at oral argument that we exercise original jurisdiction if we conclude, as we do, that there was a lack of specific finding by the trial court. Accepting as true the testimony of father and son, but bearing in mind that the son had practically complete dominion over the Pontiac, we find that the father's warnings against lending the automobile, in the circumstances of this case, did not amount to an express prohibition. Cf. Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 490-1 (1961). We are convinced that these parental admonishments were intended to encourage young Aslaksen to better preserve the investment in the Pontiac, not to bail out the insuror should the father's instructions be violated. Cf. the dissenting opinion in Baesler, 33 N.J., at p. 158.
Having eliminated the express prohibition argument, it becomes evident that young Aslaksen had a broad implied grant of the type described in Baesler, 33 N.J., at pp. 151-2, and was therefore in a position to render Baker an additional insured under the omnibus clause of the Allstate policy. This conclusion is supported in policy by the adoption in Matits v. Nationwide Mutual Ins. Co., supra, of the liberal or initial permission rule for construing omnibus clauses and by the broad construction that is generally to be given to an omnibus clause. Indemnity Ins. Co. v. Metropolitan Casualty Ins. Co., supra, 33 N.J., at p. 512.
*411 The trial court's reliance on Costanzo was not well founded. There the insured turned the vehicle over to his son for traveling back and forth between his Navy post and home. His father neither expressly forbade nor authorized his son to permit others to operate the car. At the time of the accident both the first and second permittees were in the automobile, engaged in a joint venture, but the second permittee was driving. While those circumstances clearly called for liability protection for the resulting accident, we are of the view that that decision does not control the present appeal. However, a judgment will be sustained if it is correct in result, notwithstanding that the reasoning of the court in support is erroneous. Robinson v. Ocean Twp., 123 N.J.L. 525, 527 (E. & A. 1939).
The Aslaksen Pontiac had been involved in an accident on June 18, 1958 when the son was driving, but the damage was left unrepaired. The accident was reported to Allstate and it furnished an attorney for the father and son to defend the suit instituted against both of them in the Essex County District Court to recover property damages resulting from the accident.
The MATO endorsement in the Allstate policy, already mentioned, purported to limit the coverage when the automobile was being operated by anyone except the named insured or others of a limited group. The trial court held it to be ineffective, relying on the holding in Saffore v. Atlantic Casualty Ins. Co., 21 N.J. 300 (1956), which interpreted the former Financial Responsibility Law, R.S. 39:6-1 et seq., repealed by L. 1952, c. 173, § 34, p. 570. In Saffore it was held that where an owner had been involved in an accident and failed to show satisfactory proof of future responsibility, the renewal of the policy by the insuror made it liable under the terms of the policy by virtue of the Financial Responsibility Law, R.S. 39:6-1 et seq. regardless of any attempted restriction by the insuror limiting coverage to the named insured.
The MATO clause reads as follows:

*412 "`MORE AUTOMOBILES THAN OPERATORS'
IT IS AGREED that:
1. While any automobile, included in the schedule below, is being operated, such insurance as is afforded by the policy, for Automobile Bodily Injury Liability, for Automobile Property Damage Liability, for Automobile Medical Payments and for Automobile Collision, with respect to such automobile, shall apply only while the automobile is being operated by
(a) an operator named below;
(b) an operator hired as a substitute for or successor to a named operator who has a hired chauffeur, provided written notice thereof is given to the company within ten days from the date of such hire;
(c) another person while accompanied by such an operator; or
(d) an employee of an automobile repair shop, garage, service station or public parking place, not owned in whole or in part by the named insured, in connection with repairing, calling for or delivering the automobile.
 NAMES OF OPERATORS Einar Aslaksen
2. The premiums on the following owned automobiles are based on the exclusive use of such automobiles by the operators named above:

Make of Automobile Serial Number Policy Number
 49 Pontiac L8BH18694 9 604 836
 57 Oldsmobile 578L11176 9 604 836"

The present Motor Vehicle Security-Responsibility Law, N.J.S.A. 39:6-23 et seq., in effect at the time of the accident, requires that security be posted by the operator or owner (or both) of a vehicle involved in an accident resulting in bodily injury, death or property damage in excess of $100. N.J.S.A. 39:6-25(a)(b). The statute provides that security need not be posted if the owner has a liability policy in effect at the time of the accident. N.J.S.A. 39:6-25(c)(1). The policy of insurance is to insure the named insured and "any other person using or responsible for the use of any such motor vehicle with the express or implied consent of the [named] insured." N.J.S.A. 39:6-46. The statute further provides that policies "shall be deemed amended to conform with and to contain all the provisions required by this act, any provision of the policy or certificate to the contrary notwithstanding." N.J.S.A. 39:6-48(b).
*413 Assuming acceptance of Allstate's argument that the MATO endorsement was valid, it would follow that its defense of the Aslaksens in the District Court action arising out of the earlier accident amounted to a representation that the policy contained an omnibus clause within the meaning of N.J.S.A. 39:6-46. When Allstate failed then to urge that the MATO endorsement relieved it of liability, the Director of the Division of Motor Vehicles was not alerted to the possibility that the Aslaksens might have ben uninsured and thus required to file security under N.J.S.A. 39:6-25(a). Therefore Allstate is estopped from now arguing that its policy was not required to conform to the provisions of the Motor Vehicle Security-Responsibility Law. Thus, by virtue of this estoppel, the omnibus clause, both as contained in the policy itself and as incorporated in it by the provisions of N.J.S.A. 39:6-46, was effective and the MATO endorsement ineffective under the factual background of the instant case. N.J.S.A. 39:6-48.
Equally, if not more important, is the fact that if the MATO endorsement were given any validity, it would run completely counter to the legislative policy evident in the present Motor Vehicle Security-Responsibility Law. Today the statutory omnibus clause is only required to be included in a policy "furnished as proof of financial responsibility." N.J.S.A. 39:6-46. As noted, the security section of N.J.S.A. 39:6-25 is not applicable if there is in effect "an automobile liability policy with respect to the motor vehicle involved in such accident." Although there is no explicit statutory requirement that such a policy, in order to relieve the insured from the security provision, must conform to the requirement of N.J.S.A. 39:6-46 to 48, it would be anomalous to say that the statute does not require such insurance to conform to the coverage specified in N.J.S.A. 39:6-46  i.e., coverage which insures not only the named insured but "any other person using or responsible for the use of any such motor vehicle with the express or implied consent of the insured." If this were *414 not so, an owner, by taking out a policy covering the automobile only when he was driving, could avoid the impact of the Security-Responsibility Law. N.J.S.A. 39:6-23 et seq. Remedial legislation should not be so interpreted.
Affirmed.